LANNEN *v.* TELLER.

1. LIMITATION OF ACTIONS—CREDITS TO A PARTNERSHIP WOULD
   NOT STOP RUNNING OF STATUTE AGAINST INDIVIDUAL CLAIMS.

   In an action on an open account by plaintiffs as in-
   dividuals and as a copartnership, where plaintiff had
   formerly conducted the business alone, and afterward it
   was operated as a partnership, items credited to the
   partnership could not operate to save from the statute
   of limitations his personal account with defendant prior
   to that time.[1]

2. SAME—CLAIM FOR SUPPORT OF CHILD WOULD NOT REVIVE CLAIM
   UNDER OPEN ACCOUNT IN BUSINESS TRANSACTIONS.

   Plaintiff's claim for the support and maintenance of de-
   fendant's daughter, which did not begin until 1914, did
   not operate to revive a claim under a mutual open account
   between them in the business of farming, buying cattle
   together, etc., the last item of which was in 1912, and
   was otherwise barred by the statute of limitations.[2]

3. SAME—OPEN ACCOUNT—PERSONAL LOANS ON WHICH NO PAY-
   MENTS WERE MADE NOT AN OPEN ACCOUNT.

   Distinct loans made at different times by plaintiff to de-
   fendant, upon which no payments were ever made, and
   as to which there was no reciprocity, being all on one
   side, did not constitute a mutual account current between
   the parties.[3]

4. SAME—ORAL PROMISE TO PAY DOES NOT STOP RUNNING OF
   STATUTE.

   Where plaintiff had loaned money to defendant at various
   times, a bare subsequent oral promise to pay, made within
   six years, would not prevent said indebtedness from out-
   lawing.[4]

5. SAME — EVIDENCE — DUTY OF COURT TO INSTRUCT JURY AS TO
   OUTLAWED ITEMS OF ACCOUNT.

   Where, under the record, it appears that all of the items
   of plaintiff's personal claim against defendant had out-

---

[1]Limitations of Actions, 25 Cyc. p. 1126; [2]Id., 25 Cyc. p. 1124;
[3]Id., 25 Cyc. p. 1121; [4]Id., 25 Cyc. p. 1334.

lawed with one exception, it was the duty of the court to so instruct the jury.[5]

6. SAME—OPEN ACCOUNT—EVIDENCE—SUFFICIENCY.

Evidence *held*, to fairly make the question of a mutual and open account current between plaintiff copartnership and defendant, including farm implements claimed to be jointly owned by them and sold by defendant, one for the jury.[6]

7. PARENT AND CHILD—INFANTS—EVIDENCE SUFFICIENT TO PRESENT QUESTION OF FATHER'S LIABILITY FOR SUPPORT OF CHILD.

Evidence *held*, sufficient to carry to the jury the question of defendant's liability for the support of his daughter while she was an inmate of plaintiff's home.[7]

8. LIMITATION OF ACTIONS—COUNTERCLAIMS DO NOT REVIVE OUT-LAWED CLAIMS UNLESS PROOF OF SAME IS MADE.

Items of counterclaims in defendant's special notice of set-off and recoupment, in support of which he made no proof, did not have the effect of saving plaintiffs' individual claims against defendant which had outlawed under the statute of limitations, although such might have been the case had he made such proof.[8]

Error to Livingston; Collins (Joseph H.), J. Submitted January 29, 1924. (Docket No. 52.) Decided October 6, 1924.

Assumpsit by Lawrence Lannen and others against John Teller upon an open account. Judgment for plaintiffs. Defendant brings error. Reversed.

*Louis E. Howlett* and *Don W. Van Winkle,* for appellant.

*Frank J. Shields* (*E. C. Shields* and *Alex. S. Montague,* of counsel), for appellees.

STEERE, J. At the time this case was tried plaintiff Lawrence Lannen was 64 years of age and living on his farm in the township of Cohoctah, Livingston county, and had been for many years engaged in farm-

[5]Limitations of Actions, 25 Cyc. p. 1437; [6]Id., 25 Cyc. p. 1437; [7]Parent and Child, 29 Cyc. p. 1615; [8]Limitations of Actions, 25 Cyc. p. 1413.

ing, occasionally dealing in stock and buying sheep for feeding. Plaintiff Roy M. Lannen, son of Lawrence, was 35 years of age at the time of the trial and a married man. He had been engaged in other pursuits for a time but lived on the farm with his father since 1912, associated with him in the same calling. Defendant, John Teller, was also an elderly man and a farmer living in the same neighborhood and on the same road as plaintiffs. Their farms were on opposite sides of the road and their buildings within 100 rods of each other. The elder Lannen and Teller had known each other over 40 years. The latter's second wife, Maggie, whom he married in 1899, was a sister of the elder Lannen's wife. She died in 1911, leaving one child by Teller, a daughter named Orabelle Teller. Plaintiffs and defendant and their families were on friendly terms for many years, closely associated together in neighborly relations with mutual confidence and freedom both socially and in business matters. Of the long intimacy between Lawrence Lannen and Teller, Roy Lannen testified, and it is not disputed:

"Father and John have been very intimate in all of their business relations as far back as I can remember. They owned approximately half of their tools together. In order to tell how many years they owned their tools that way you will have to ask some one older than I am. They both bought land from time to time so that they had about the same number of acres, changed work back and forth and used these tools in common and (n) either of them ever kept any account of days' work for what the other did. If either of them had anything in or about their barns that the other needed they felt free to help themselves. When one went to the other's house they were not in the habit of knocking before they went in, and they pretty nearly lived as one family except in separate houses. They were like two brothers, and if either of them had any difficulty the other was the first to go there."

During the many years of such continued intimacy the parties from time to time had unquestioned business matters between them of various kinds and magnitude, which were at the time so recognized by both, as well as other transactions in which as they occurred the line between mutual accommodations or gratuitous assistance and business transactions as generally understood was apparently not always well defined.

Defendant married again not very long after the death of his second wife, Maggie, the only sister of Mrs. Lawrence Lannen. . Maggie's only daughter, Orabelle, lived with her father until about 13 years of age and then by mutual consent of all parties in interest became a member of Lawrence Lannen's household, making her home there until about the time she was married in 1921. Her aunt, Mrs. Lawrence Lannen, in describing the situation, testified that she came there about January 1, 1914, and remained until May, 1921; had no other home during those years, and "treated me as a mother;" that she "liked her," was proud of her accomplishments and "tried to make a nice girl out of her." Roy testified that "she practically lived in the family as a daughter would live in any family."

In 1920, Teller held an auction of his personal property and left his farm. Some farm tools and machinery which they owned together were disposed of at that sale as they had agreed should be done. Lawrence Lannen testified that when they made the arrangement to include their jointly owned implements in the sale Teller agreed they would have a settlement after it was over, which did not, however, eventuate because, as Lawrence briefly describes the end of their long continued David and Jonathan relation: "A few days after that I asked him for a settlement—he told me to go to h—l." Lawrence

preferred to go to law and after it was conclusively shown that Teller stood steadfast in his attitude towards a settlement this action in assumpsit was begun by plaintiffs, on February 28, 1922, to recover the balance claimed due from defendant in their dealings through the many years of their intimacy.     A bill of particulars was furnished on demand which covers 10 full pages of the printed record and includes an item of $2,212.50 for board, lodging and maintenance of Teller's daughter, Orabelle, at his request.

Defendant pleaded the general issue with special notice of four defenses, including the statute of limitations and a counterclaim of set-off and recoupment covering between 7 and 8 pages of the printed record, beginning with a claim of $500 for caring for, nursing, sitting up nights with and taking Lawrence to a hospital when he was sick, both physically and mentally, and caring for his business affairs during that time, followed by a claim of $2,500 for the services of his minor daughter, Orabelle, while she lived and worked in Lawrence's home, and a liberal list of other items amounting to over $5,000 more directly relating to their business dealings as claimed.     The case was tried by jury in the Livingston county circuit court resulting in a verdict in plaintiffs' favor for $1,438.95.

Lawrence and Roy Lannen formed their copartnership in 1912, filing the proper credentials with the county clerk as required by law.     The partnership took over Lawrence's business and continued up to the time of the trial of this case.     In that connection Lawrence Lannen testified:

"John Teller and I were in the habit of settling out by his barn, quite often we figured on the side of his barn.     We had various settlements after the date of this note but that was not included because it slipped my mind.     Roy came home and took hold of the business in April, 1912.     I don't think John and I

had any settlements after that date.    Roy looked after the financial end of it after that time more than I did.   *   *   *   Roy commenced and did the business. He and John seemed to do the dealing, buying cattle together, bulls and such as that."

Seemingly in harmony with the title of this case the items in plaintiffs' bill of particulars fall into three classes or sets of claims, one of Lawrence Lannen personally, one of Roy Lannen as an individual and the other of Lawrence Lannen & Son as a copartnership.    Before entering upon the trial defendant's counsel interposed a preliminary objection on the ground that plaintiffs had combined three distinct causes of action apparently to evade the statute of limitations, but after some discussion consented that the controversy between the parties as indicated by the pleadings might "all be threshed out in this one proceeding" and a general verdict taken, it being understood that the defense of the statute of limitations as to any of the items was not waived.

After the jury had been drawn and before any testimony was taken counsel for each side made an opening statement to the jury.   Defendant's counsel announced he would state defendant's claim at that stage of the proceedings, "in view of the rather involved proofs," and that the jury might have clearly in mind defendant's position while listening to the examination of plaintiffs' witnesses.    He then proceeded to state at some length what "our proofs will show," including the claim set up in defendant's "cross-declaration or counterclaim set-off" as called, under which it would be shown that there was a balance in defendant's favor for which judgment would be asked; also stating it would be shown all those matters had been settled, and that plaintiffs' claims were outlawed.    No witnesses were sworn by the defense, but at the close of plaintiffs' testimony both parties rested.

Defendant's 26 assignments of error are grouped and argued under two heads as follows:

"Error in applying the statute of limitations to the claims of the different plaintiffs.

"Error in submitting the claim of plaintiff Lawrence Lannen for the board of Orabelle Teller and in the receiving of evidence in reference thereto, and in failing to direct a verdict against plaintiff Lawrence Lannen on that branch of the case."

The trial court in general terms properly instructed the jury as to the statute of limitations and nature of an open mutual account, reviewed the claims of parties at considerable length, explaining that the three classes of claims should be passed upon separately in applying those rules of law to the facts, and pointed out certain items for which there could be no recovery under the undisputed evidence and left others of each class for determination by the jury. What items the jury allowed to make up the sum of their general verdict rests in conjecture, but each of the classes, with exception of certain items rejected by the court, were before the jury to select from.

As to Lawrence Lannen's individual account, he was in partnership with his son in the business he had formerly conducted from 1912 to the time of the trial, and items credited to the partnership could not operate to save from the statute of limitations his personal account with defendant prior to that time. Aside from his claim for support of Orabelle, his personal items in the bill of particulars of which he makes proof mostly antedate 1912 and all more than six years prior to commencement of this action. He stated on cross-examination that he had a book in which he kept an account of his "dealings with John Teller" and when he produced it said, "I kept in this book the amount of the items John was owing me from time to time," that he started to keep it in 1909, but when shown a 1910 calendar on the back concluded

he had started it in January, 1910, finally admitting that "nearly all" of the items were entered at the same time, "in about 1917," and that it contained no items for the board or care of defendant's daughter, Orabelle, which was the largest single item against defendant in their bill of particulars and he did not know just when he first decided to make a charge for it, or how much.    The clearly shown personal items of Lawrence Lannen, as shown by the bill of particulars and testified to by him in connection with his book account ("nearly all" entered about 1917), related to his dealings with Teller in their farm and stock transactions and ended in 1912, when he formed a partnership with his son Roy who he testified then commenced and did the business and "he and John seemed to do the dealing, buying cattle together," etc. That was ten years before this action was begun. Their "mutual and open account current" in relation to that business was thereafter between Lawrence Lannen & Son and Teller, with Roy acting for the copartnership.    Orabelle did not go to the Lawrence home to live until 1914.    Lawrence's claim for her support after that time had no relation to the mutual account current between him individually and Teller, the last item of which was in 1912, and did not operate to revive it.

Roy Lannen's personal claims against Teller as shown in plaintiffs' omnibus bill of particulars and stated in his counsel's brief are as follows:

"No. 7, for $100 December, 1915.    Item No. 8, November 29, 1915, $153.31.    Item No. 9, cash loaned by Roy M. Lannen to defendant in 1916, $60.    Item No. 10, taxes in 1915-16 paid by Roy M. Lannen for defendant, $247."

Item No. 7 is for $100 loaned defendant in December, 1915; of it he testified that Teller was then in a lawsuit and wanted $100, and he loaned it to him;

that Teller said "he would repay me later, when he was through that, no special time was fixed, and he has never repaid me any of that sum." Of item No. 8 he testified that it was for half of a note which he paid at a bank, saying:

"Mr. Teller and I went into the McPherson bank and Mr. Teller told me to ask them if we could have a short extension. They said they did not own the note, that Dick Barrown owned the note, and they did not have anything to say about it, and I drew a check for the full amount at that time to the McPherson bank. * * * One-half of this amount which is $153.31, which is carried out in this item 9 (8), Mr. Teller never paid any part of it, and I claim it is all now due as an item in this suit."

Item 9 he said was for cash loaned by him to defendant in 1916, at what time in 1916 is not shown, but he stated that defendant told him "he would pay it back when he was in shape to." According to Roy's testimony the taxes of 1915-16 amounting to $131.73, added to the taxes of 1914, amounting to $107.52, would approximate the sum claimed under item 10 of the bill of particulars. He testified that Teller said he "would pay me when he was in condition, fit to, when he was through his lawing business. * * * He offered several times to give me a note, but it was at times when it was inconvenient, * * * when we were in a hurry to go somewhere that he would speak about it."

He also testified that when he loaned Teller the money he was having difficulty over his mother's will and promised to pay him "when he was done with these lawsuits," which were "not all cleaned up" until about 1918, and his counsel showed that "the second Teller case" was decided March 27, 1918. As he relates their status, these items were distinct loans made at different times upon which no payments were ever made. As to them there was no reciprocity.

They were all on one side. They did not constitute a mutual account current between the parties. *Fuerbringer* v. *Herman*, 225 Mich. 76. A bare subsequent oral promise to pay them made within six years would not prevent them from outlawing.

The statute of limitations in personal actions is six years and section 12324, 3 Comp. Laws 1915, provides:

"In actions brought to recover the balance due upon a mutual and open account current, the cause of action shall be deemed to have accrued at the time of the last item proved in such account."

Although Roy testifies he paid Teller's taxes for those years, he leaves to conjecture or inference the time when he paid them. But assuming that he paid them when due, his claim for the taxes of 1916 only would not be outlawed when this suit was commenced in February, 1922. On this record the jury should at least have been instructed that all other items of his personal claim were barred by the statute of limitations.

Plaintiffs' testimony fairly made the question of a mutual and open account current between the copartnership and defendant after 1912 one for the jury. Included in that account would be the proceeds of farm implements sold by agreement at the auction sale of March 23, 1924, which item 14 of plaintiffs' bill of particulars states were "jointly owned by defendant and plaintiffs."

We are of opinion that plaintiffs' testimony carried the question of support of Teller's daughter, Orabelle, during the time she was an inmate of the Lannen home to the jury. While the relations of the parties and conditions as shown can fairly be urged against such claim, the Lannens were under no legal responsibility for support and care of Teller's minor child. There was no suggestion of an adoption or

surrender by him of his parental rights, or denial by him of his responsibility.    He paid for her clothing while there and the cost of her musical education, as to which Mrs. Lannen said she was very proud of her.    He furnished a horse for her to ride to school for a time and later when she attended school at Howell paid for her room and allowed her to get groceries from the store there on his account.    Mrs. Lannen testified she went to live with them at Teller's suggestion that it would be better for her to attend the Oak Grove school from there, as they got up earlier in the morning and would get her to school in time.    The Lannens then had no children in their home while his was composed of himself, Orabelle, her stepmother and her two children.    There is also some testimony that he recognized his financial obligations to them for the care of his child.    Mrs. Lannen testified:

"John was at our house, we were in our little kitchen visiting in there.    He said, 'If anything happens to me and you think Orabelle isn't going to get her just dues from the home, you file a claim for her support against the estate.'
"*Q.* What's that?
"*A.* File a claim against the estate for her support. I think the word he used was 'her keep.'"

Lawrence Lannen testified:

"She was there about a year or nearly a year, I won't say for certain, and one day he was up there, my wife and I were present, we were all in the yard, he said:    'You people, if anything happens to me in the future, I want you to file a claim against my estate for Orabelle's support.' * * *
"*Q.* What did he say in that conversation that he would do if he was alive at that time?
"*A.* He would take care of it; he said, 'You will be fair with me.'"

On another occasion he testified:

"My wife was taken sick in the winter and she was quite seriously sick, sicker than we thought she was, and she got pretty nervous, and I went down to John's and told him the condition and told him Orabelle was quite worrisome to her, I wished he would take her back, in her own home.    He said he couldn't do it.

"*Q.* When was this, how long after the first conversation?

"*A.* Oh, it must have been two years, three years.

"*Q.* What if anything did he say about payment to you for his daughter's keep and maintenance and care in your home, if anything, at that time?

"*A.* He said I needn't worry, if anything happened to him I could file a claim against his estate."

It is argued for plaintiffs that their individual claims are saved against the statute of limitations by items of counterclaims in defendant's special notice of offset and recoupment.    Such might be the case had he made any proof of those items, but he did not and was content to rest the case on plaintiffs' testimony, as he had a right to do.    The burden of proof was upon plaintiffs to make out their case.    They were allowed to go to the jury for a general verdict on items which the record shows were barred by the statute of limitations as well as those which were not.

The judgment is therefore reversed, with costs to defendant, and a new trial granted.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.